In re Paul H. STEIGERWALD, t/d/b/a Stagg's T.V., Appliances and Furniture and Doris S. Steigerwald, individually and jointly as husband and wife, Debtors.

WESTINGHOUSE CREDIT
CORPORATION, Plaintiff,

v.

Paul H. STEIGERWALD, t/d/b/a Stagg's T.V., Appliances and Furniture and Doris S. Steigerwald, individually and jointly as husband and wife; Hamilton Bank; Penn Appliance Distributors, Inc.; and Richard A. Umbenauer, Trustee, Defendants.

Bankruptcy No. 82–00578 T.
Adv. No. 82–0731.

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 30, 1983.

Jacques H. Geisenberger, Jr., Lancaster, Pa., for plaintiff.

Richard K. Dieterle, Jr., Lancaster, Pa., for debtors.

Jonathan M. Crist, Harrisburg, Pa., for Penn Appliance.

Richard A. Umbenauer, Lancaster, Pa., trustee.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

In this adversary proceeding, the only contested issue is which of two secured creditors has the priority security interest in certain inventory collateral of Paul H. Steigerwald, t/d/b/a Stagg's T.V. (hereinafter "debtor"), one of the Chapter 7 debtors in this case. One secured creditor is the Westinghouse Credit Corporation (hereinafter "W.C.C."), which claims its priority interest in the disputed inventory by virtue of the after-acquired inventory clause in its security agreement with the debtor. The other secured creditor is Penn Appliance Distributors, Inc. (hereinafter "Penn Appliance"), which claims its priority interest by virtue of its purchase money security interest in the disputed inventory. For the reasons hereinafter given, we find that, according to the Pennsylvania version of the Uniform Commercial Code, W.C.C.'s security interest has priority over Penn Appliance's security interest.[1]

## I. FACTS

We shall briefly state the facts essential to a resolution of this case. On February 8, 1977, as part of the arrangement for inventory financing of the debtor by W.C.C., the debtor and W.C.C. entered into a security agreement. The security agreement provided, *inter alia,* for W.C.C. to have a security interest in all of the debtor's "present and future inventory". Financing Statements evidencing the security agreement were filed with the appropriate governmental agencies on February 15, 1977. W.C.C. thereafter proceeded to finance inventory of the debtor.

In February, 1978, National Central Bank (whose name was later changed to Hamilton Bank) acquired a valid purchase money security interest in inventory furnished to the debtor by Penn Appliance. Soon thereafter, Penn Appliance began supplying the debtor with inventory subject to the purchase money security interest. The disputed inventory in this case is that which was supplied by Penn Appliance to the debtor, pursuant to the purchase money security interest, from January 26, 1981 through October 7, 1981.

Pursuant to state legal proceedings, W.C.C. seized all of the debtor's inventory, including the disputed inventory, on January 22, 1982. On January 28, 1982, Hamilton Bank (formerly National Central Bank) validly assigned all of its rights in its purchase money security interest in the disputed inventory to Penn Appliance. On February 11, 1982, the debtor and his wife filed a joint Chapter 7 bankruptcy petition.

The only factual dispute in this case is whether or not W.C.C. timely "received notification" of the purchase money security interest within the meaning of the former 13 Pa.C.S.A. § 9312(c), Act 1979, Nov. 1, P.L. 255, No. 86, § 1, effective January 1, 1980, which states:

(c) Purchase money security interests in inventory.—A purchase money security interest in inventory collateral has priority over a conflicting security interest in the same collateral if:

(1) the purchase money security interest is perfected at the time the debtor receives possession of the collateral;

(2) any secured party whose security interest is known to the holder of the purchase money security interest or who, prior to the date of the filing made by the holder of the purchase money security interest, had filed a financing statement covering the same items or type of inventory, has received notification of the purchase money security interest before the debtor receives possession of the collateral covered by the purchase money security interest; and

(3) such notification states that the person giving the notice has or expects to acquire a purchase money security

---

1. This Opinion constitutes the findings of fact and conclusions of law as required by Bankruptcy Rule 7052.

interest in inventory of the debtor, describing such inventory by item or type.[2]

The facts relating to this above-cited provision of the Pennsylvania version of the Uniform Commercial Code will be discussed *infra*.

Following the filing of the debtor's bankruptcy petition, both secured creditors have filed pleadings pursuant to both 11 U.S.C. § 362(d) (relief from automatic stay) and 11 U.S.C. § 554 (abandonment of property of the estate). By stipulation of all parties and our Order approving the stipulation, all of the inventory seized by W.C.C. may be sold by W.C.C., the proceeds being held in escrow pending our disposition of this case. In essence, therefore, W.C.C. is claiming the proceeds from the sale of all of the debtor's inventory. Penn Appliance is claiming the proceeds from the sale of that part of the debtor's inventory subject to Penn Appliance's purchase money security interest. Neither the debtor nor the trustee of the bankruptcy estate has filed any pleadings nor claimed any interest in the proceeds from the sale of the inventory. Nor has any other creditor. Thus, the present controversy is strictly between W.C.C. and Penn Appliance.

## II.  DISCUSSION

Although Penn Appliance's purchase money security interest in the disputed inventory attached subsequent to W.C.C.'s security interest in the same inventory, Penn Appliance would still prevail if it can satisfy all of the requirements of the former above-quoted 13 Pa.C.S.A. § 9312(c). W.C.C. correctly concedes that Penn Appliance has satisfied the requirements of § 9312(c)(1). However, W.C.C. contends that it did not receive notification (or otherwise learn) of the purchase money security interest in question until January, 1982, during the state legal proceedings involving W.C.C.'s seizure of the debtor's inventory

and well after October 7, 1981, the last date upon which Penn Appliance furnished the debtor with inventory covered by the purchase money security interest. Thus, W.C.C. argues that the requirements of § 9312(c)(2) have not been met, thereby negating Penn Appliance's alleged security interest priority under § 9312(c).

Penn Appliance submits, however, that W.C.C. timely "received notification", within the meaning of § 9312(c)(2), of the purchase money security interest as a result of a meeting in the summer of 1978 between the president and credit manager of Penn Appliance, on the one hand, and the Central Pennsylvania district manager for W.C.C. and his superior, on the other hand.[3] The president of Penn Appliance, Elmer A. Groene, Jr., and the W.C.C. district manager, Ronald Ross, testified regarding this meeting at the hearing of this case. Both agreed that the meeting took place at the Penn Appliance offices in the summer of 1978 and that the purpose of the meeting was W.C.C.'s attempt to persuade Penn Appliance to finance the inventory of the dealers which it supplied through W.C.C. Mr. Groene testified that each dealer, including the debtor, which Penn Appliance supplied was discussed individually, along with whatever financing arrangements existed for the various dealers. He felt that W.C.C. was thus made aware that Penn Appliance was supplying the debtor on a purchase money security interest basis.

Mr. Ross testified that he could not recall the specific discussion of any particular dealer, including the debtor. He further stated: "There were a number of accounts that were brought up. I'm sure Stagg's was probably included." (Notes of Testimony, p. 70). Mr. Ross also testified, regarding the meeting, that "no documentation was presented at all. What I recall from the meeting, Mr. Groene's credit manager was going through a box of ledger

---

**2.** The present 13 Pa.C.S.A. § 9312(c), as amended by Act 1982, Nov. 26, P.L. 696, No. 201, § 1, effective in 180 days, is not applicable to this case. See §§ 2 through 6 of Act 1982, Nov. 26, P.L. 696, No. 201.

**3.** Penn Appliance concedes that W.C.C. did not receive written notification of the purchase money security interest prior to January, 1982.

cards, mentioning names. And that's how we were discussing accounts." (Notes of Testimony, p. 70). We note here that Mr. Ross's testimony that Penn Appliance did not present any documentation to W.C.C. at this meeting was not contradicted by Mr. Groene. Mr. Ross further stated: "The purpose of the meeting was not to find out about individual accounts as it was to offer our services as a whole to handle all the floor planning for Penn Appliance." (Notes of Testimony, p. 65). Mr. Ross further testified that not all of the accounts that were discussed were secured accounts. Although Mr. Groene's testimony is somewhat ambiguous on this point, we do not read it as contradicting Mr. Ross's testimony that unsecured accounts were also discussed at the meeting. Mr. Ross also testified that he did not learn of the purchase money security interest in question until January, 1982, during the aforementioned state legal proceedings involving W.C.C.'s seizure of the debtor's inventory.

In arguing that the meeting in the summer of 1978 constituted "notification" pursuant to § 9312(c)(2), Penn Appliance relies upon the case of *GAC Credit Corp. v. Small Business Administration,* 323 F.Supp. 795 (W.D.Mo.1971), which involved the identical provision of the Uniform Commercial Code. In that case, the issue was whether or not a telephone conversation between the branch manager of a purchase money security interest holder in inventory (plaintiff) and an officer of a bank which held a prior security interest on after-acquired inventory constituted "notification" of the purchase money security interest pursuant to Mo.Rev.Stat. § 400.9—312(3)(b).[4] The plaintiff's branch manager telephoned the bank officer and informed him that the plaintiff intended to "floor plan" certain RCA merchandise for the debtor on a "secured money interest." The bank officer testified that he could not remember any use of the term "secured money interest" during the conversation. However, he further testified that under a "floor plan" agreement he knew that the

plaintiff would be advancing funds to the debtor so that the debtor could acquire merchandise. He also testified that he knew that the plaintiff would claim a security interest in the merchandise covered by a "floor planning" agreement.

The Court in *GAC Credit Corp.* first held that written notification is not required under § 400.9—312(3)(b). It then held that the telephone conversation did constitute "notification" pursuant to § 400.9—312(3)(b) and went on to find that the plaintiff's purchase money security interest had priority in the disputed inventory over the prior security interest on after-acquired inventory.

■ We agree with *GAC Credit Corp.* that the § 9312(c)(2) notification need not be in writing. We also do not question the Court's judgment in favor of the purchase money security interest holder. However, we believe that *GAC Credit Corp.* is clearly factually distinguishable from the present case. In the first place, the testimony in *GAC Credit Corp.* was essentially consistent regarding notification of the purchase money security interest. The bank officer, in effect, testified that he understood from the telephone conversation that the plaintiff intended to claim a purchase money security interest in the merchandise that it was financing. In the present case, however, Mr. Ross, according to his testimony, certainly did not come away from the meeting with any specific knowledge of the purchase money security interest in question.

Secondly, in *GAC Credit Corp.,* it appears that the plaintiff's branch manager telephoned the bank officer specifically to discuss the plaintiff's purchase money security interest vis-a-vis the dealer in question. In our case, Penn Appliance did not even request the meeting. Rather, it was requested by W.C.C. in its attempt to solicit Penn Appliance's business. Any alleged notification of the purchase money security interest in question coming out of this meeting

---

4. Mo.Rev.Stat. § 400.9—312(3)(b) is identical in substance to Pennsylvania's 13 Pa.C.S.A. § 9312(c)(2).

would have been largely accidental and indirect. Also, unlike the telephone conversation in *GAC Credit Corp.* in which only the one dealer was discussed, at the meeting in our case, many different dealers were discussed, including some whose accounts were unsecured.

We also believe that the following statement from J. White and R. Summers, *Handbook of the Law under the Uniform Commercial Code (Hornbook Series),* Second Edition (1980), p. 1049, n. 43, is persuasive and very much relevant to the present case:

> Of course no sensible businessman would intentionally rely upon an oral notification; he will give written notification under 9–312(3). If our purchase money lender does not dot his "i's" and cross his "t's", but simply makes a phone call to the prior lender, what result? Neither 9–312(3) nor subsections 25 or 26 of 1–201 state that the notification must be in writing. However, the phrase in 9–312(3)(c) "such notification states" certainly presents the image of a written notification. We conclude that the '62 version of 9–312(3) permits oral notification, but *we would expect a court to be slow to rely upon an uncorroborated statement of the purchase money lender.* (Emphasis added).

All of the Uniform Commercial Code provisions discussed in the above-quoted statement are substantively identical to the provisions of the Pennsylvania Commercial Code applicable to our case.

In sum, we do not feel that the alleged "notification" at the meeting by Penn Appliance of the purchase money security interest was sufficiently clear or direct to constitute "notification" pursuant to § 9312(c)(2). This alleged "notification" was also, of course, uncorroborated. Under these circumstances, it would likewise not be proper to charge W.C.C. with the receipt of such alleged "notification" pursuant to § 9312(c)(2). Therefore, we hold that the discussions during the meeting in the summer of 1978 do not constitute "notification" of the purchase money security interest in question under § 9312(c)(2).

■ Penn Appliance has advanced three other arguments in this case. One argument is that a telephone conversation between Mr. Groene and Mr. Ross in 1981 constitutes "notification" pursuant to § 9312(c)(2). However, there is no evidence as to when in 1981 this conversation took place. Therefore, this argument must fail because § 9312(c)(2) requires that, to be effective, the "notification" must be received "before the debtor receives possession of the collateral covered by the purchase money security interest; . . . ." The disputed inventory having been received by the debtor between January 26, 1981 and October 7, 1981, there is no evidence that the alleged "notification" preceded the debtor's receipt of any of the disputed inventory.

■ Penn Appliance also argues that W.C.C.'s security interest had become unperfected by the time that W.C.C. filed its Complaint in this case and that, therefore, Penn Appliance's perfected security interest has priority over W.C.C.'s unperfected security interest. As Penn Appliance points out, under the former 13 Pa.C.S.A. § 9403(b), Act 1979, Nov. 1, P.L. 255, No. 86, § 1, effective Jan. 1, 1980, which is applicable to our case, a Financing Statement evidencing a security interest generally lapses after five years unless a Continuation Statement is filed prior to the lapse.

According to this statute, the security interest becomes unperfected upon such lapse. Because W.C.C.'s Financing Statements were filed on February 15, 1977 and there is no evidence that Continuation Statements were filed, argues Penn Appliance, W.C.C.'s security interest became unperfected on February 15, 1982, before W.C.C. filed its Complaint in this case.

However, Penn Appliance's argument must be rejected because the debtors filed their bankruptcy petition on February 11, 1982, less than five years after W.C.C.'s Financing Statements were filed. When a bankruptcy petition is filed before the lapse of a Financing Statement, the security interest in the debtor's goods does not become

unperfected, but rather remains perfected even if a Continuation Statement is not filed. See *In re Chaseley's Foods, Inc.,* 30 B.R. 452 (D.C., N.D.Ind.1983), and the cases cited therein.

Penn Appliance also contends that the after-acquired inventory clause in W.C. C.'s security agreement with the debtor is invalid as a so-called "dragnet clause". This argument is without merit. After-acquired property clauses are expressly validated by the Uniform Commercial Code. See 13 Pa.C.S.A. § 9204 and the Uniform Commercial Code Official Comments thereto. Also see *In re Middle Atlantic Stud Welding Co.,* 503 F.2d 1133 (3rd Cir.1974); *In re Beverage,* 30 U.C.C.Rep. 373 (M.D.Pa. (Bkrtcy.) 1980).

For all of the foregoing reasons, we conclude that W.C.C. is entitled to all of the proceeds from the sale of the debtor's inventory which it seized pursuant to state legal proceedings on January 22, 1982.